CASE NO. 19-50891

UNITED STATES OF AMERICA,
                          Plaintiff - Appellee
                    V.
WILLIAM JOSEPH DUBIN,
                          Defendant - Appellant

---

Consolidated with 19-50912

UNITED STATES OF AMERICA,
                          Plaintiff - Appellee
                    V.
DAVID FOX DUBIN,
                          Defendant - Appellant

---

In the
United States Court of Appeals
for the Fifth Circuit

---

Appeal from the United States District Court
For the Western District of Texas

---

Appellant's Petition for Rehearing En Banc

---

Gross & Esparza, P.L.L.C.
Michael C. Gross
1524 North Alamo Street
San Antonio, Texas  78215
(210) 354-1919
(210) 354-1920 Fax

Attorney for the Appellant,
David Dubin

CASE NO. 19-50891

UNITED STATES OF AMERICA,
                    Plaintiff - Appellee
V.
WILLIAM JOSEPH DUBIN,
                    Defendant - Appellant

_____

Consolidated with 19-50912

UNITED STATES OF AMERICA,
                    Plaintiff - Appellee
V.
DAVID FOX DUBIN,
                    Defendant - Appellant

_____

Certificate of Interested Persons

_____

The undersigned counsel of record certifiy that the following listed persons and

entities as described in this Court's Rule 28.2.1 have an interest in the outcome of this

case. These representations are made in order that the judges of this court may

evaluate possible disqualification or recusal.

Mr. David Fox Dubin, the Appellant

Counsel for Mr. David Fox Dubin on appeal:

    Mr. Michael C. Gross, San Antonio, Texas

Counsel for Mr. David Dubin at trial:

      Mr. Michael McCrum, San Antonio, Texas

      Mr. Scott McCrum, San Antonio, Texas

Counsel for the United States:

      Mr. Joseph H. Gay, Jr., AUSA, San Antonio, Texas

      Mr. Mark R. Stelmach, AUSA, Austin, Texas

      Mr. Rex G. Beasley, AUSA, San Antonio, Texas

      Mr. Justin Chung, AUSA, Del Rio, Texas

The Honorable Xavier Rodriguez, United States District Court for the Western

      District of Texas, San Antonio Division

                    /s/ Michael C. Gross
                    Michael C. Gross,
                    Attorney of Record for the Appellant,
                    David Fox Dubin

## Statement Regarding Fed. R. App. P. 35(b)(1)

This proceeding involves a question of exceptional importance because an issue of first impression was decided in the panel decision regarding the "use" requirement in the identity theft statute wherein the panel held that a healthcare provider used a patient's identity in billing Medicare even though services were provided to the patient but the provider misrepresented how or why the patient was treated, and this holding conflicts with the authoritative decision of another United States Court of Appeals that has addressed the issue, specifically Judge Boggs in *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015) (Provider's claim that a beneficiary was properly transported by ambulance does not constitute a "use" of the beneficiary's identification because the provider really did transport the beneficiary but without the required EMT in the ambulance.). Judge Elrod was on the panel and wrote separately to endorse the Sixth Circuit's position in *Medlock*.

# Table of Contents

                                          **Page**

Certificate of Interested Persons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Statement Regarding Fed. R. App. P. 35(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . iv

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Statement of the Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Course of Proceedings and Disposition of the Case. . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Issue One. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

> Regarding the "use" requirement in the identity theft statute, the panel held as an issue of first impression that a healthcare provider used a patient's identity in billing Medicare even though services were provided to the patient but the provider misrepresented how or why the patient was treated, and this holding conflicts with the authoritative decision of another United States Court of Appeals that has addressed the issue. *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015).

> Argument and Authorities in Support of Issue One. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Copy of Opinion Sought to be Reviewed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

<u>Table of Authorities</u>

<u>Cases</u>

*Leocal v. Ashcroft*, 543 U.S. 1,
    125 S.Ct. 377, 160 L.Ed.2d 271 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Dubin*, No. 19-50912
    (5th Cir., December 4, 2020). . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 6, 7, 8, 9

*United States v. Mahmood*, 820 F.3d 177
    (5th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

*United States v. Medlock*, 792 F.3d 700
    (6th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 7, 8, 9, 10, 11

*United States v. Michael*, 882 F.3d 624
    (6th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

<u>Constitutions And Statutes</u>

18 U.S.C. § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1028A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 7, 8, 9, 11

18 U.S.C. § 1347. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1349. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1320a-7b. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5th Cir. R. 35. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. App. P. 35. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

<u>Miscellaneous</u>

*Black's Law Dictionary* (10th ed. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Oxford Dictionary of English* (3d ed. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 9

To the Honorable Court of Appeals:

David Dubin, the Appellant, pursuant to Fed. R. App. P. 35 and 5th Cir. R. 35, files this petition for rehearing en banc and in support would show:

## Statement of the Issue

Regarding the "use" requirement in the identity theft statute, the panel held as an issue of first impression that a healthcare provider used a patient's identity in billing Medicare even though services were provided to the patient but the provider misrepresented how or why the patient was treated, and this holding conflicts with the authoritative decision of another United States Court of Appeals that has addressed the issue. *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015).

## Statement of the Course of Proceedings and Disposition of the Case

The superseding indictment alleged the Appellant violated: 18 U.S.C. § 371, conspiracy to pay and receive healthcare kickbacks; 42 U.S.C. § 1320a-7b(b)(2), offering to pay and paying illegal remuneration (kickbacks); 18 U.S.C. § 1349, conspiracy to commit healthcare fraud; 18 U.S.C. §§ 1347 & 2, healthcare fraud and aiding and abetting; and 18 U.S.C. §§ 1028A & 2, aggravated identity theft and aiding and abetting. (ROA.435-459) (this appeal is limited to the electronic record of Case No. 19-50912). The jury found the Appellant guilty of Counts 12 (conspiracy to commit healthcare fraud), 19 (healthcare fraud and aiding and abetting), and 25

1

(aggravated identity theft and aiding and abetting), contrary to his plea, and not guilty of the remaining counts charged against him. (ROA.687-695). The Appellant was sentenced to imprisonment for twelve months and one day on each of Counts 12 and 19 to run concurrently, imprisonment for twenty-four months on Count 25 to run consecutive to Counts 12 and 19, ordered to pay $282,019.92 in restitution and a $94,006.64 forfeiture. (ROA.1976-1982). The Appellant timely filed a notice of appeal. (ROA.2034). This Court affirmed the judgment and sentence in a published opinion with a concurring opinion by Elrod, Circuit Judge. *United States v. Dubin*, No. 19-50912 (5th Cir., December 4, 2020).

## Statement of Facts

> District judge at sentencing: "[T]o me this doesn't seem to be an aggravated identify theft case . . . I hope I get reversed on the aggravated identity theft count . . . I think there is a very good likelihood that you're going to be acquitted on Count 25 . . ."

(ROA.4998-4999, 5012, 5079).

The Appellant's father, William Dubin, was a Texas licensed psychologist and formed Psychological A.R.T.S., P.C. (hereinafter "PARTS"). *United States v. Dubin, supra,* at 2. PARTS enrolled in Medicaid which allowed funding for the psychological testing of children housed in Texas' emergency shelter system. *Id.* This case involved children who received psychological testing while housed in emergency shelters. *Id.*

This petition for rehearing en banc concerns only Count 25 which charged the Appellant with identity theft. (ROA.435-459). The Appellant was charged with six identity theft counts (Counts 20-25, each of which regarded Patients F, G, H, I, J, and L, respectively) and was acquitted of all identity theft counts except for Count 25 which involved Patient L. (ROA.453-457, 687-695). Count 25/Patient L involved a single Medicaid billing for $540.00 for a 3-hour psychological evaluation of Patient L on May 30, 2013 for which Medicaid paid PARTS $338.10. (ROA.456-457, 15716, 19769, 20905). Regarding Count 25, the district judge stated as follows:

> Here, what the Dubins were doing were they were using names of patients and using their Medicaid identification numbers and then billing. But then the whole crux of this case is how they were billing, and it turns out that's criminal the way they were doing their business, but it wasn't aggravated identity theft.

(ROA.4999).

For psychological services, Medicaid required billing to reflect a modifier regarding the type of service and the type of provider that conducted the service. (ROA.2656). Services by a licensed psychological associate (LPA) required the modifier UC because an LPA is paid at 70% of the fee that would have been paid to a licensed psychologist. (ROA.2580, 2589-2591, 10548). Services by a clinical psychologist required the modifier AH. (ROA.2580, 2589-2591, 10548). It was improper to use the modifier AH when billing for LPA services. *Id.* Psychological

services included psychological interviews, testing, assessments, interpretation, and report writing. (ROA.3359).

Hours billable to Medicaid for services typically included: (1) face-to-face time with patients for interview/psychological testing and the time for scoring and interpreting testing results (ROA.8856, 10566, 12332); and (2) supervisors reading, evaluating, analyzing, or revising reports (ROA.2772-2773, 2885-2890, 3557). The psychological testing typically lasted 6.75 hours and included: (1) over 1½ hour or more on the interview; (2) the BASC assessment 45 minutes; (3) the SASSI another 45 minutes; (4) the WASI-II an hour; (5) the WRAT an hour; (6) the MACI an hour; and (7) the Trauma Symptom Checklist for Children 45 minutes. (ROA.2774-2781). These hours easily exceed 8 hours.

Patient L was a child in an emergency shelter 80 miles away from PARTS. *Dubin, supra,* at 3. Johnson worked for PARTS as an LPA, traveled in April 2013 to the shelter to meet with Patient L, conducted psychological testing and assessments on Patient L, and was then interrupted by William Dubin and told to not conduct a clinical interview because Patient L had been psychologically evaluated in the last year. (ROA.3112, 3114, 3116, 3150-3152, 3157-3158, 3195, 20899). After this date, the Appellant instructed a PARTS employee to bill Medicaid for three hours for Patient L with the AH modifier in the amount of $540.00 for which Medicaid paid $338.10. (ROA.3588-3589, 15716).

PARTS conducted billable testing of Patient L. Johnson testified that it was appropriate to stop if a potential calendaring issue arose. (ROA.3197). The Texas Medicaid Healthcare Partnerships (TMHP) manual authorized billing for psychological testing when provided by a psychiatrist, psychologist, or LPA under the supervision of a psychologist. (ROA.10563). Johnson was an LPA at this time and William Dubin, a licensed psychologist, was performing direct supervision of Johnson including when Dubin entered the room and instructed Johnson to cease testing of Patient L. PARTS conducted testing of Patient L at the request of the facility, so the TMHP manual authorized PARTS to bill for the testing. PARTS kept the test results and documented extenuating circumstances that impacted the ability to complete the testing (DE2-13012 shows the client was discharged from the facility). (ROA.10563, 15652-15703). GE 2702 established that PARTS even sent an email to the facility director offering to prepare a report for Patient L based upon the completed testing, but the facility director declined. The psychological testing of Patient L by Johnson had value and was recognized as billable by the TMHP manual.

<u>Argument and Authorities</u>

<u>Issue One</u>

Regarding the "use" requirement in the identity theft statute, the panel held as an issue of first impression that a healthcare provider used a patient's identity in billing Medicare even though services were provided to the patient but the provider misrepresented how or why the patient was treated, and this holding conflicts with the authoritative decision of another United States Court of Appeals that has addressed the issue. *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015).

<u>Argument and Authorities in</u>
<u>Support of Issue One</u>

The elements of 18 U.S.C. § 1028A requires that a defendant: (1) knowingly used; (2) another person's means of identification; (3) without lawful authority; (4) during and in relation to theft of government money or property. *United States v. Medlock, supra*. With respect to Count 25, the panel agreed that this case presents "[a]n issue of first impression" in that this Court has not previously addressed the definition of "use" under 1028A. *Dubin, supra,* at 2, 10. The panel stated this Court in *Mahmood* previously addressed the definition of "without lawful authority" by "[l]ooking to the plain language of the statute" and determined the meaning as proscribing the "use of another person's means of identification, absent the right or permission to act on that person's behalf in a way that is not contrary to the law."

*Dubin* at 10, *citing United States v. Mahmood*, 820 F.3d 177 (5th Cir. 2016). *Mahmood*, however, did define "use" with respect to 1028A.

The panel discussed *Medlock*. *Dubin, supra* at 10-12. The defendant in *Medlock*, who owned an ambulance company that transported Medicaid patients for dialysis appointments, was charged and convicted in a healthcare fraud case, in part, of two counts of aggravated identity theft by using the identification of two patients who were actually transported by ambulance but whose transport was unnecessary and therefore ineligible for the paid Medicaid reimbursement. *Medlock, supra*. The issue on appeal was whether the defendant's claim to Medicaid for these patients constituted a "use" of the patients' identification pursuant to 1028A. *Id.* The prosecution claimed the defendant "used" the name and Medicaid Identification Numbers of these Medicaid beneficiaries when the defendant submitted the claim (with the patient name and ID number) to Medicaid for reimbursement without lawful authority because the claim falsely stated the transport was required. *Id.*

The court held that under the facts of the case, the definition of "use" must be more limited than suggested by the government. *Id.* The defendant did transport the Medicaid beneficiaries whose names were entered on the Medicaid forms – the defendant lied only about the defendant's eligibility for reimbursement for the transport. *Id.* There was nothing about the transported beneficiaries that entitled them,

as opposed to other Medicaid beneficiaries, to reimbursed rides. *Id.* The defendant

misrepresented how and why the beneficiaries were transported, but the defendant did

not use the beneficiaries' identities to do so. *Id.* The term "without lawful authority"

includes situations where a defendant had permission of a person whose information

was misused by the defendant. *Id.* The court found that the defendant acted "without

lawful authority" under 1028A but also held that the defendant's misrepresentation

that the beneficiaries were transported did not constitute a "use" of the beneficiaries'

identification under 1028A because the beneficiaries actually were transported. *Id.*

The court reversed the convictions for aggravated identity theft under the facts of that

case.

The Sixth Circuit reaffirmed *Medlock* in *United States v. Michael*, 882 F.3d 624

(6th Cir. 2018). *Dubin* at 11-12. *Michael* was authored by Judge Sutton who endorsed

the distinction in *Medlock* between designating a particular person who received

services but just misrepresented the nature of those services as opposed to asserting

that a particular person received services who never did. *Michael, supra.* In *Michael*,

the defendant/pharmacist used a doctor's identification (name and ID number) and a

patient's identification (name and date of birth), to bill for insurance reimbursement

for medication neither prescribed by the doctor nor requested by the patient. *Id.* Judge

Sutton favorably discussed *Medlock's* definition of "use" and applied it in *Michael*

when he stated, "Had [defendant], in the course of dispensing drugs to a patient under a doctor's prescription, only inflated the amount of drugs he dispensed, the means of identification of the doctor and patient would not have facilitated the fraud." *Id.*

The Government recently acknowledged that the meaning of the word "use" in a criminal statute depends on "context." Br. for the United States at 38, *Van Buren v. United States*, No. 19-783 (filed Aug. 27, 2020). In the case at bar, the panel declined to follow the definition of "use" as determined in *Medlock* and instead took a definition of "use" from the *Oxford Dictionary of English* and *Black's Law Dictionary*. *Dubin* at 11. The panel concluded use of a person's identification occurs under 1028A if a person takes affirmative acts in a health-care fraud, such as the submission for reimbursement of testing, using means of identification. *Id.* at 12-13. Judge Elrod, in her concurring opinion, stated that the Sixth Circuit's *Medlock* definition of "use" better interprets the 1028A statute. *Dubin* at 21. Judge Elrod disagreed with *Mahmood's* broad interpretation of 1028A and agreed with *Medlock* that "use" does not occur if services are provided but the provider lies to Medicaid about how or why the services were provided. *Id.* at 22. Judge Elrod stated that, "In my view, the Sixth Circuit has the better interpretation of the statute. There was simply no identity theft in *Medlock*, and there is none here." *Id.* Judge Elrod concluded:

David Dubin lied to Medicaid about the exact contours of the services Patient L received, but did not misrepresent that Patient L did indeed receive services. Patient L's not receiving the full array of psychological services does not erase the fact that Patient L – and not someone else – received services. When he billed Medicaid, he lied about when a clinical interview was performed and about the type of person that performed the services. Thus, David lied about *when* and *how* Patient L received services, but did not lie about Patient L's identity or make any misrepresentations involving Patient L's identity. Nor did anyone else pretend to be Patient L. Therefore, any forgery alleged in this case, as in *Medlock*, was related only to the nature of the services, not to the patient's identity.

*Id.*

The Supreme Court has said that a court "cannot forget" the ordinary meaning of the term that it is "ultimately" defining, *Leocal v. Ashcroft*, 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), and here that term is "identity theft." Yet as Judge Elrod points out, no ordinary speaker of English would call what happened here "identity theft." To the extent that there is ambiguity in the meaning of "use," *Medlock's* narrower conception of the term must control. The rule of lenity provides that ambiguous criminal statutes are to be construed in favor of the accused. *Id.* The rule of lenity, which applies not just to crimes themselves but also to sentencing enhancements, requires ambiguity to be resolved in favor of defendants. *Id.* The rule of lenity should apply in the case at bar.

The panel should have used the *Medlock* definition of "use" and should have found the evidence is insufficient to prove under 1028A the Appellant's "use" of Patient L's identification because Patient L was actually tested by Johnson. The Appellant's claim to Medicaid for Patient L did not constitute a "use" of Patient L's identification pursuant to 1028A. Assuming arguendo the Appellant lied about the Appellant's eligibility for reimbursement for the psychological evaluation, it is still undisputed that Patient L was tested. Assuming arguendo the Appellant misrepresented how and when Patient L was evaluated, the Appellant did not use Patient L's identity to do so. The Appellant acted "without lawful authority" under 1028A, but the Appellant's misrepresentation about how and when Patient L was tested did not constitute a "use" of Patient L's identification because Patient L actually was tested. Construing the above evidence in the light most favorable to the verdict, this Court should conclude that a reasonable jury could not have found beyond a reasonable doubt the aggravated identity theft alleged in Count 25 and should overturn that identify theft conviction.

## Conclusion

Wherefore, premises considered, the Appellant prays this Court withdraw its opinion dated December 4, 2020, reverse the judgment and sentence of the trial court, render judgment of acquittal on Count 25, and remand for a new sentencing proceeding.

Respectfully submitted,

Gross & Esparza, P.L.L.C.

/s/ Michael C. Gross
Michael C. Gross
State Bar No. 08534480
1524 North Alamo Street
San Antonio, Texas 78215
(210) 354-1919
(210) 354-1920 Fax

Attorney for the Appellant,
David Dubin

## Certificate of Service

I hereby certify that on the 15th day of December, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to Joseph H. Gay, Jr., Assistant United States Attorney, 601 N.W. Loop 410, Suite 600, San Antonio, Texas 78216, and I certify that there are no non-CM/ECF participants. The required privacy redactions have been made pursuant to 5th Cir. Rule 25.2.13. This electronic submission is an exact copy of the paper document pursuant to 5th Cir. Rule 25.2.1. This document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Michael C. Gross

## Certificate of Compliance

1.     The brief complies with the type-volume limitation imposed by Rule 35(b)(2)(A) of the Federal Rules of Appellate Procedure because the brief contains 3513 words excluding the table of contents and table of authorities.

2.     The brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in

a proportionally spaced typeface using WordPerfect 6.1 in 14 point font and Times New Roman type style.

/s/ Michael C. Gross
Michael C. Gross,
Attorney for David Dubin

Dated: December 15, 2020

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 4, 2020

Lyle W. Cayce
Clerk

No. 19-50891

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

WILLIAM JOSEPH DUBIN,

*Defendant—Appellant,*

CONSOLIDATED WITH

No. 19-50912

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

DAVID FOX DUBIN,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CR-227-1
USDC No. 1:17-CR-227-2

Before Barksdale, Elrod, and Ho, *Circuit Judges*.

Rhesa Hawkins Barksdale, *Circuit Judge*:

William Joseph Dubin and David Fox Dubin were convicted on charges arising from a scheme to defraud Texas' Medicaid program. Between them, they raise eight issues: sufficiency of the evidence for their convictions; running of the statute of limitations based on the superseding indictment; restitution and forfeiture amounts; and William Dubin's length of sentence. An issue of first impression for our court is whether David Dubin's fraudulently billing Medicaid for services not rendered constitutes an illegal "use" of "a means of identification of another person", in violation of 18 U.S.C. § 1028A. AFFIRMED.

## I.

William Dubin was a licensed psychologist in Texas, and formed "Psychological A.R.T.S., P.C." (PARTS), in Austin, Texas, for his psychology practice. He served as its chief officer and director. His son, David Dubin, later began working for PARTS on the business side of the corporation, and provided no psychological services.

PARTS is an enrolled Medicaid provider and, as such, agreed to comply with Medicaid laws and regulations. Texas' Medicaid program provides, *inter alia*, funding for psychological evaluations of children within Texas' emergency-shelter system. In that regard, McKenzie served as the

president of the board of directors of Williams House, an emergency youth shelter located approximately 80 miles from Austin. As a part of its operations, Williams House arranged for mental-health assessments and psychological evaluations at the shelter.

Former PARTS office manager King testified at trial that, between January and March 2011, McKenzie and William Dubin discussed an opportunity for PARTS to conduct evaluations at Williams House. The email discussion concluded with William Dubin's offering McKenzie "10% off the top of the first year's gross income from this project". After the discussions, PARTS began to send its employees and clinicians to Williams House and billed Medicaid for the work, as well as paying ten percent of the gross income to McKenzie.

PARTS employees performed intake interviews and psychological evaluations at Williams House. To receive Medicaid reimbursement for the work, PARTS had to certify whether a licensed psychologist performed it. Work performed by a licensed psychologist had a higher Medicaid reimbursement rate than that performed by other clinicians. At trial, King testified that she explained billing procedures and requirements to William Dubin, but that he insisted that PARTS bill at the higher rate, despite services not being performed by a licensed psychologist.

In April 2011, William Dubin directed King to pay McKenzie ten percent, in advance, of the amount estimated to be billed to Medicaid for the upcoming month. One group of evaluations that stemmed from Williams House was largely performed by a non-licensed psychologist. But, PARTS billed Medicaid for those evaluations as if they had been performed by a licensed psychologist.

Eventually, McKenzie received a contract providing $50 per hour for his referral services as an independent contractor. The contract purportedly

served as a means to provide McKenzie with an above-board role for which he could be paid for his referrals. Based on time cards he submitted, McKenzie would be paid $50 per hour for referrals; but, the rate was not a "real number". Along this line, McKenzie routinely failed to submit time cards or other estimates of time spent under this contract. Instead, King devised a method to calculate McKenzie's hours after-the-fact. She calculated ten percent of the gross amount reimbursed by Medicaid for Williams House patients, divided it by McKenzie's contract hourly rate of $50, and entered the resulting number as McKenzie's hours worked. This ten-percent calculation practice continued after King left PARTS in December 2011. After a PARTS employee resigned, she provided the calculation material to the Texas Attorney General.

Townsend worked as a biller at PARTS, reporting to David Dubin. Townsend billed Medicaid for PARTS' services rendered. David Dubin and Townsend discussed PARTS' billing procedures, and he instructed her to bill Medicaid for the licensed-professional rate, despite this being a violation of Medicaid rules because some services were performed by students or interns, and were, therefore, ineligible for reimbursement.

Medicaid rules limit the number of billable hours per patient. After a conversation with David Dubin, Townsend frequently received his questions about how many hours remained for a patient, and she was often instructed to add hours to a patient's record after the patient had been examined and PARTS had billed for reimbursement. In one instance, Townsend was asked to add three hours of bills as "corrected claims" for 19 previously seen patients. These added-claims generated additional payments from Medicaid.

David Dubin similarly instructed Townsend's replacement, Gordon, to continue these practices, and included additional instructions for Gordon

to work around other Medicaid limits. David Dubin told Gordon to bill the maximum of eight hours regardless of whether they had been performed.

After receiving a tip, Texas' Medicaid Fraud unit inquired into PARTS' billing practices. After receiving patient files and communications related to PARTS' billing procedures, it was revealed that PARTS billed for services provided by a licensed psychologist and received by 300 patients totaling 1,896 hours, although those services were not performed by a licensed psychologist.

William Dubin, David Dubin, and McKenzie were charged in June 2017 for, *inter alia*, violating: 18 U.S.C. §§ 2 (aiding and abetting); 1349 (conspiracy to commit health-care fraud); 1347 (health-care fraud); 1028A (aggravated identity theft); 371 (conspiracy to violate 42 U.S.C. §§ 1320a-7b (b)(1) and (2)); and 42 U.S.C. §§ 1320a-7b (b)(1) and (2) (soliciting or receiving illegal remuneration and offering to pay illegal remuneration). The superseding indictment in September 2018 did not include earlier charges against McKenzie; he pleaded guilty prior to the Dubins' trial.

Trial began on 9 October 2018 and ended on the 26th. William and David Dubin testified.

For the 25 counts against him, William Dubin was convicted on three: count one, violating 18 U.S.C. § 371 (conspiracy to pay and receive health-care kickbacks); and counts nine and ten, violating 42 U.S.C. § 1320a-7b(b)(2) (offering to pay, and paying, illegal remuneration for Patients C (count nine) and D (count ten)). For the 25 counts against him, David Dubin was convicted on three: count twelve, violating 18 U.S.C. § 1349 (conspiracy to commit health-care fraud); count nineteen, violating 18 U.S.C. §§ 2, 1347 (aiding and abetting and health-care fraud for Patient L); and, count twenty-five, violating 18 U.S.C. §§ 2, 1028A (aiding and abetting and aggravated identity theft for Patient L).

At sentencing, the court adopted the presentence investigation report (PSR), as modified, for William Dubin and imposed, *inter alia*: five years' probation; restitution of $61,230; and forfeiture in the same amount. For David Dubin, the court adopted the PSR, as modified, and imposed, *inter alia*: imprisonment of twelve months and one day for counts twelve and nineteen; two years' imprisonment for count twenty-five; restitution of $282,019.92; and forfeiture of $94,006.64.

## II.

David Dubin claims the superseding indictment substantially amended the charges so that the statute of limitations had run. Both defendants challenge: the sufficiency of the evidence for their convictions; and the restitution and forfeiture amounts. And, William Dubin challenges the length of his sentence. Each challenge fails.

## A.

For counts nineteen and twenty-five, David Dubin asserts the Government's amended indictment substantially altered the charges such that the superseding indictment may not revert back, and thus the two counts were time-barred. If so, his sufficiency-of-the-evidence challenges become moot because the statute ran, and those two convictions would be vacated. Essentially, if David Dubin's assertions are correct on this issue, he is also without a charge for his third conviction, on count twelve.

David Dubin failed, however, to raise this statute-of-limitations defense until in a post-trial motion for ineffective assistance of counsel, filed by his trial counsel, that admitted as much. His appellate counsel (different from trial counsel) acknowledged this at oral argument. Failure to raise this issue until post-trial waives it. *United States v. Lewis*, 774 F.3d 837, 845 (5th Cir. 2014) (holding criminal defendant must raise statute-of-limitations issue

at trial, and defendant waives the defense if raised for first time in post-trial motion).

## B.

For William and David Dubin's sufficiency-of-the-evidence challenges for their convictions, if defendant timely moves for judgment of acquittal, as in this instance, the preserved challenge is reviewed *de novo*. *E.g.*, *United States v. Oti*, 872 F.3d 678, 686 (5th Cir. 2017) (citation omitted). Such review "is highly deferential to the verdict" and "consider[s] the evidence in the light most favorable to the [G]overnment, with all reasonable inferences and credibility determinations made in [its] favor". *Id.* (internal quotation marks and citations omitted). For that review, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt". *Id.* (emphasis in original) (citation omitted). In that regard, "it [is] within the sole province of the jury as the fact finder to decide the credibility of the witnesses and to choose among reasonable constructions of evidence"; accordingly, "[w]e will not second guess the jury in its choice of which witnesses to believe". *United States v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994) (citations omitted). Among the evidence the jury considered was the Dubins' trial testimony. The jury, as a result, was able to weigh this testimony against the evidence offered by the Government.

### 1.

David Dubin's sufficiency challenges are addressed first. We then turn to William Dubin's.

#### a.

David Dubin challenges his conviction on count twelve for conspiracy to commit health-care fraud, in violation of 18 U.S.C. §§ 1347, 1349. Again, a conviction is affirmed unless no rational juror could have convicted defendant. *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Conspiracy to commit health-care fraud requires the Government to show beyond a reasonable doubt: "(1) two or more persons made an agreement to commit health care fraud; (2) . . . defendant knew the unlawful purpose of the agreement; and (3) . . . defendant joined in the agreement with the intent to further the unlawful purpose". *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020) (quoting *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018)).

David Dubin's sufficiency challenges are based on his being acquitted on other health-care-fraud counts, and his assertion that, therefore, the only evidence that can be considered to support a conviction for conspiracy to commit such fraud is the evidence for his three counts of conviction: twelve, nineteen, and twenty-five. Further, he contends there is no Medicaid 12-month-cycle that he could violate under this scheme. In doing so, he discusses his theory of the Government's case: bills for Patient L, whose examination and billings the Government used to charge David Dubin on count twelve, were held in abeyance until a later date to avoid a Medicaid rule proscribing multiple billings in a 12-month-cycle; and, because he forced PARTS' billing team to hold Patient L's reimbursements, he purposefully avoided the rule, and therefore committed health-care fraud. His claim relies, however, on there being no 12-month rule, and accordingly he could not violate it.

But, the conviction does not hinge on whether there is a 12-month-cycle. David Dubin's conviction is valid, regardless of whether the crime was completed, if he entered into *any* scheme to defraud, including a scheme to bill Medicaid for services not provided.

The superseding indictment charged him with, *inter alia*, conspiracy to defraud Medicaid under 18 U.S.C. § 1349. Significant evidence established the elements of conspiracy, showing David Dubin's: direction of licensed psychological associates (a post-doctoral associate position requiring licensure by the Texas Behavioral Health Council; not equivalent to a licensed psychologist) and unlicensed students to conduct psychological tests on behalf of PARTS; submitting bills to Medicaid with improper modifiers to obtain a higher reimbursement rate; and, directing tests not to be supervised as required.

The evidence established a valid basis for conviction on conspiracy to commit health-care fraud. As discussed, we cannot reconsider the weight of the evidence or attempt to balance the credibility of witnesses—that task is "the sole province of the jury". *United States v. Hernandez-Palacios*, 838 F.2d 1346, 1350 (5th Cir. 1988); *see also United States v. Duvall*, 846 F.2d 966, 975 (5th Cir. 1988) ("It is not possible, or even proper for us to speculate about the basis of the jury's decision."). David Dubin's attempt to exclude evidence on other counts for which the jury returned not-guilty verdicts is similarly unavailing. Not-guilty verdicts may not be used to attack the evidence supporting a guilty verdict. *United States v. Powell*, 469 U.S. 57, 66 (1984) ("We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them.").

### b.

In challenging his conviction on count twenty-five for aggravated identity theft and aiding and abetting, in violation of 18 U.S.C. §§ 2 and 1028A, David Dubin claims his acts did not constitute "use" within the meaning of the statute. The identity-theft statute requires a two-year

sentence for "[w]hoever . . . knowingly transfers, possesses, or *uses*, without lawful authority, a means of identification of another person" during the commission of an enumerated felony. 18 U.S.C. § 1028A(a)(1) (emphasis added). The statute stacks the two-year sentence with any sentence arising from an enumerated felony, which includes health-care fraud, in violation of 18 U.S.C. § 1347. *See* 18 U.S.C. § 1028A(c)(5).

Our court has not previously considered the definition of "use" pursuant to the identity-theft statute, § 1028A. It has, however, considered whether a person acted "without lawful authority" under that statute. *See United States v. Mahmood*, 820 F.3d 177, 187 (5th Cir. 2016). Looking to the plain language of the statute, our court held it "proscribes the . . . use of another person's means of identification, absent the right or permission to act on that person's behalf in a way that is not contrary to the law". *Id.* at 188 (citing *United States v. Osuna-Alvarez*, 788 F.3d 1183, 1186 (9th Cir. 2015) (alteration in original) ("[I]llegal use of the means of identification alone violates § 1028A."); *United States v. Ozuna-Cabrera*, 663 F.3d 496, 499 (1st Cir. 2011) ("[R]egardless of how the means of identification is actually obtained, if its subsequent use breaks the law—specifically, during and in relation to the commission of a crime enumerated in subsection (c)—it is violative of § 1028A(a)(1).")).

In claiming he did not "use" the identity of another in the commission of the health-care fraud, David Dubin does not claim he had *lawful authority to use* the identities of patients that comprised the health-care fraud. Restated, he claims only that he did not *use* those identities. In doing so, he relies upon *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015), and contends, under that decision's holding on "use", he cannot be convicted under the identity-theft statute. Notably, the court first looked to the plain meaning of the word to hold that "use" means, *inter alia*, to avail oneself of. *Id*. at 705–06. But *Medlock*'s holding is also based in part on a prior decision's

defining "use" in the identity-theft statute, various canons of construction, and the Sixth Circuit's Pattern Jury Instructions "contemplat[ing] a narrow reading of 'use'". *Id.* at 706. The "use" in *Medlock* turned on what kind of service defendants provided, and whether they overbilled for services. *Id.* at 709. We do not accept *Medlock's* definition.

As we did in *Mahmood*, we look to the plain language of the statute. We hold the plain meaning of "use" answers the question at issue: whether David Dubin "use[d]" the means of identification of another, without lawful authority, to violate § 1028A. The plain meaning of "use" is: "take, hold, or deploy (something) as a means of accomplishing a purpose or achieving a result; employ: [as in] 'she used her key to open the front door'", *Oxford Dictionary of English* (3d ed. 2010); and, "to employ for the accomplishment of some purpose" and "to avail oneself of", *Black's Law Dictionary* (10th ed. 2014). 913 F.3d at 1334. In short, deciding whether a person "use[d]" something seems to be a relatively straightforward yes or no, despite David Dubin's contention to the contrary. Although David Dubin urges our adopting the holding on "use" from *Medlock*, the facts of this case do not fit squarely into the holding or facts of *Medlock*. There defendants, who operated a non-emergency ambulance company that transported Medicare patients to certain medical appointments, ultimately provided the transportation service but falsely stated that stretchers were required for transport. *Medlock*, 792 F.3d at 703–05. In contrast, Patient L did not receive services. While Patient L did undergo psychological testing by a psychological associate, there was no clinical interview, evaluation, or report provided to the shelter that assessed the patient's needs or made any recommendations with respect to the best program or treatment for the patient. ROA.19-50912.3151-57, 3958-59.

Furthermore, the sixth circuit, in two subsequent cases, took different approaches to "use" than it did in *Medlock*, one of which was a health-care

fraud/identity-theft case, *United States v. Michael*, 882 F.3d 624 (6th Cir. 2018). *See also United States v. White*, 846 F.3d 170 (6th Cir. 2017). Both cases provide a slightly different definition of "use" than what David Dubin urges our adopting and are more compatible with the issue at hand. *Michael* does, it is true, cite *Medlock* favorably, but only insofar as "[t]he definition[] noted in . . . *Medlock* cover[s] the conduct alleged in this case." *Michael*, 882 F.3d at 628. It does not, however, explicitly adopt *Medlock*'s definition. *Michael* also favorably cites *White*, which "rejected a cramped reading of 'uses[.]'" *Id.*

The eleventh circuit also addressed the definition of "use" under the identity-theft statute, holding that the plain, ordinary meaning of the statute resolves the question. *United States v. Munksgard*, 913 F.3d 1327, 1334 (11th Cir. 2019) (citing *Michael*, 882 F.3d at 628). *Munksgard* confronted circumstances similar to those in this case, albeit bank fraud's being the predicate offense. *Id.* at 1333. There, defendant admitted he acted "without lawful authority", there was an enumerated predicate felony, and there was no dispute whether defendant used a "means of identification". *Id.* at 1333–34. Holding that the plain meaning of "use" resolved whether defendant "use[d]" a means of identification, the court held defendant had violated the statute. *Id.* at 1334. Simply put, "to use an object is [t]o convert [it] to one's service; to avail oneself of [it]; to employ [it]; as, to use a plow, a chair, a book". *Id.* (citing *Webster's Second New International Dictionary* 2806 (1944)).

Consistent with the plain meaning of "use", the statute operates simply as a two-part question to determine criminal conduct: did defendant use a means of identification; and, was that use either "without lawful authority" or beyond the scope of the authority given? Our court's opinion in *Mahmood* alludes to this approach. *See Mahmood*, 820 F.3d at 187–90 ("the statute plainly applies to circumstances like these, where [defendant] gained

access to his patients' identifying information lawfully, but then proceeded to use that information unlawfully and in excess of his patients' permission").

Pursuant to that two-part standard, David Dubin "use[d]" the means of identification of the patients; and he did so without their lawful authority, as well as in a manner beyond the scope of their lawful authority. At oral argument here, David Dubin's counsel admitted as much by noting that resolution of this question is ultimately a scope-of-authority issue.

Patient L's means of identification—the patient's Medicaid reimbursement number—was used, or employed, by David Dubin in the reimbursement submissions to Medicaid. Based upon the records provided to Medicaid for reimbursement, David Dubin asserted Patient L received services that he did not receive. Needless to say, in order to be eligible for Medicaid reimbursement as submitted, the services provided to Patient L had to have been performed as submitted. PARTS submitted Patient L's information for reimbursement as having been performed by a licensed psychologist; instead, it was only partially performed by a licensed psychological associate, as defined *supra*. Patient L was never interviewed, despite PARTS' usual procedure, and David Dubin instructed the psychological associate that performed some of the services to cease evaluation of the patient, yet David Dubin submitted the evaluations as though they had been completed. Effectively, part performance of the psychological services rendered them illusory, but David Dubin billed Medicaid for a completed service.

Applying these facts to our two-part standard for the statute: David Dubin "use[d]" means of identification when he took the affirmative acts in the health-care fraud, such as his submission for reimbursement of Patient L's incomplete testing; he used the means of identification. Next, David

Dubin does not dispute he had no lawful authority to submit these tests for reimbursement, like the defendant in *Mahmood*. 820 F.3d at 189. In short, David Dubin "use[d]" Patient L's means of identification "without lawful authority" under § 1028A.

## 2.

Turning to William Dubin, he challenges the sufficiency of the evidence for: his conviction of conspiracy to pay and receive health-care kickbacks, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a (count one); and, his convictions for offering to pay, and paying, illegal remunerations, in violation of 42 U.S.C. § 1320a-7b(b)(2) (counts nine and ten).

### a.

Regarding his conviction on count one—conspiracy to pay and receive health-care kickbacks—the statute criminalizes: "knowingly and willfully giv[ing] or receiv[ing] a benefit for referring a party to a health care provider for services paid for by a federal health care program". *United States v. Sanjar*, 876 F.3d 725, 746 (5th Cir. 2017). A conspiracy to violate the health-care kickback statute requires "an agreement to do so, knowing and voluntary participation in the conspiracy, and an overt act by one member in furtherance of the unlawful goal". *United States v. Gevorgyan*, 886 F.3d 450, 454 (5th Cir. 2018) (citation and quotation omitted).

William Dubin primarily attacks the evidence by asserting: his co-conspirator, McKenzie, had no power to control patients' receiving PARTS' care; and, therefore, the co-conspirator could not refer patients in violation of the statute. He also claims he lacked the requisite intent under the statute: the Government had to show he intended to gain undue influence over the reasoning of another person; and it failed to do so. *See United States v. Miles*, 360 F.3d 472, 477–78 (5th Cir. 2004). Finally, he asserts that, because

McKenzie was paid *after* the services were rendered to patients, the payments to him could not have been to induce the services.

The Government presented evidence from former PARTS employees regarding William Dubin's agreement with McKenzie to provide him a ten-percent fee for patients referred to PARTS by Williams House. Emails described the relationship between them as a fee-for-referral arrangement, and the two outlined their arrangement in a contract that provided for McKenzie's being paid $50 an hour. But, the Government presented testimony undermining that hourly rate. William Dubin emailed McKenzie about the "opportunity" previously offered, reiterating that, under their agreement, McKenzie would receive "10% off the top of the first year's gross income from this project".

As discussed *supra*, once PARTS began working with the Williams House patients, William Dubin directed McKenzie's fees to be calculated after-the-fact, so they would consistently add up to ten percent of PARTS' reimbursements for patients from Williams House. And as also discussed, because McKenzie rarely submitted time sheets, the PARTS administrative assistant, King, calculated ten percent of the Williams House patient-payments from Medicaid, and then McKenzie's hours "worked" was calculated to reflect the ten percent he was owed. The primary PARTS employee calculating McKenzie's fee left PARTS during the scheme, but trained her replacement to continue carrying it out. According to King's testimony, William Dubin admitted it was "unethical for [PARTS] to pay somebody for referrals, so we needed to show it as an hourly rate".

William Dubin's reading of *Miles* ignores a critical fact pattern that violates the kickback statute: "payments to a [party] based on the number of patients that he signed up with the service". 360 F.3d at 480. As in *Miles*,

William Dubin and PARTS paid McKenzie based on the number of patients referred.

b.

Concerning William Dubin's convictions on counts nine and ten for offering to pay, and paying, illegal remunerations, in violation of 42 U.S.C. § 1320a-7b(b)(2), the Government was required to show defendant, beyond a reasonable doubt: knowingly and willfully offered to pay, or paid, any remuneration to any person; to induce that person; to refer anyone for a service eligible for payment under a federal health-care program, or to arrange for the furnishing of such a service. *See* 18 U.S.C. § 1320a-7b(b)(2)(A). As with his conspiracy conviction in count one, William Dubin claims the jury ignored evidence that McKenzie could not assert control over the Williams House patients. He also claims: Williams House's remote location necessarily limited which psychological providers were willing to provide services, so the relationship between PARTS and Williams House was out of necessity and was not an illegal remuneration scheme.

This sufficiency challenge improperly asks our court to reweigh the evidence presented to the jury and hold it was legally impossible for him to induce McKenzie to refer patients, or that the payments to McKenzie were not remunerations under the statute. As discussed *supra*, the payments constituted health-care kickbacks under the statute.

Regarding whether William Dubin could not induce McKenzie to refer patients, the Government presented evidence to show William Dubin did so: McKenzie's role as an executive in the decision-making process at Williams House; his updating on the "99% probability that [he] can get [PARTS patients] in to the emergency shelter for testing"; and, William Dubin's emphasizing to PARTS staff the need to keep McKenzie happy in order to "keep getting referrals". This evidence could reasonably describe a

relationship by which McKenzie had the power and ability to provide PARTS with access, and William Dubin sought to ensure that continued.

## C.

With evidence sufficient for each of the convictions, we turn to the Dubins' challenges to restitution and forfeiture. Both use the same theories to challenge the district court's calculation of each.

### 1.

The legality of a restitution award is reviewed *de novo*; if legally permitted, the amount ($61,230 for William, and $282,019.92 for David, Dubin) is reviewed for abuse of discretion. *United States v. Cothran*, 302 F.3d 279, 288 (5th Cir. 2002). Along that line, the Mandatory Victims Restitution Act of 1996 requires defendant to pay restitution to the victim in a property-loss case. 18 U.S.C. § 3663A. When the underlying offense of conviction is fraud, the court may award restitution for actions taken as part of the scheme. *Cothran*, 302 F.3d at 289 ("[W]here a fraudulent scheme is an element of the conviction, the court may award restitution for 'actions pursuant to that scheme'". (quoting *United States v. Stouffer*, 986 F.2d 916, 928 (5th Cir. 1993))).

For the Dubins' crimes, the victim is the Government, *vis-à-vis* Texas' Medicaid program, which receives funding from the United States Department of Health and Human Services. *See, e.g.*, *United States v. Jones*, 664 F.3d 966, 984 (5th Cir. 2011); *see also Mahmood*, 820 F.3d at 193 ("We must consider that Medicare is the victim of [the] fraud . . . ."). Restitution awards are limited "to the actual loss directly and proximately caused by . . . defendant's offense of conviction". *Mahmood*, 820 F.3d at 196 (citation omitted). In calculating loss amounts for purposes of restitution, the Government bears the burden to demonstrate the loss. *See* 18 U.S.C. § 3664(e); *see also Mahmood*, 820 F.3d at 196. The burden then shifts, and "a

defendant, to be entitled to an offset against an actual loss amount for purposes of restitution, must establish (1) 'that the services . . . were legitimate' and (2) 'that Medicare would have paid for those services but for his fraud'". *United States v. Mathew*, 916 F.3d 510, 521 (5th Cir. 2019) (quoting *Mahmood*, 820 F.3d at 194); *see also United States v. Ricard*, 922 F.3d 639, 659 (5th Cir. 2019) ("The defendant meets this burden by establishing '(1) that the services [he provided to Medicare beneficiaries] were legitimate' and (2) 'that Medicare would have paid for those services but for his fraud'") (quoting *Mathew*, 916 F.3d at 521 (alteration in original)).

The Dubins claim our court's recent decision in *Ricard* entitles them to an offset calculated at actual value of services provided. *See* 922 F.3d at 658–59. *Ricard* and *Mahmood*, they assert, require deducting the amount Medicaid would have paid, but-for the fraud. *See Ricard*, 922 F.3d at 659–60; *see also Mahmood*, 820 F.3d at 196.

But the Dubins have the burden to satisfy both prongs of the standard set out in *Mahmood*, and they fail on both fronts. 820 F.3d at 194. At sentencing, the Dubins claimed the services provided by PARTS "were valuable to those . . . to whom they were provided" and, as a result, the Dubins should receive the offset. This claim is unavailing, however.

At trial, and again at sentencing, the Government provided substantial evidence that the purported services were illegitimate: poor record keeping by the Dubins, improper billing based on who performed the services, and services performed by individuals who were not employees at the time they provided services. The Dubins failed to overcome this strong showing and thus fall short of carrying their burden on the first prong. They also failed to prove that Medicaid would have paid for the services because their bills were submitted in violation of Medicaid rules and regulations for psychological treatment and without modifiers for testing administered by psychological

associates, interns, and students (as opposed to licensed psychologists). The evidence of work done by students and unlicensed individuals shows illegitimate services that were billed for reimbursement by PARTS and the Dubins.

2.

Next, we consider the Dubins' challenge to the forfeiture orders: $61,230 for William, and $94,006.64 for David, Dubin. A forfeiture order's legality is reviewed *de novo*; its factual bases for clear error. *United States v. Reed*, 908 F.3d 102, 125 (5th Cir. 2018), *cert. denied* 139 S. Ct. 2655 (2019).

The PSR calculated the total amount of improper benefits conferred on William Dubin from the kickback scheme to be $61,230. For the intended loss related to the health-care fraud perpetrated by William and David Dubin, the PSR found it totaled $659,085.98, of which $282,019.92 was paid to PARTS, because the poor record keeping at PARTS made it impossible to separate legitimate, from illegitimate, Medicaid claims. *See United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012) ("[Defendant] should not reap the benefits of a lower sentence because of his ability to defraud the [G]overnment to such an extent that an accurate loss calculation is not possible."). When the fraud cannot be parsed for properly-obtained amounts, "the burden shifts to . . . defendant to make a showing that particular amounts are legitimate. Otherwise, the district court may reasonably treat the entire claim for benefits as intended loss". *Id.* The loss amount for David Dubin of $94,006.64 was based on his share of PARTS being one-third, and accordingly his share of the impermissible benefit to be one-third. *See Reed*, 908 F.3d at 127 (holding the court must apportion forfeiture amounts between defendants).

The Government demonstrated the Dubins' mutual failures to separate proper payments and valid records from improper payments and

invalid records.  After acquiring case-file information, the PSR presented the total amounts to be forfeited by William Dubin and David Dubin, and it bears sufficient indicia of reliability.  *See United States v. Dickerson*, 909 F.3d 118, 130 (5th Cir. 2018).

## D.

The final issue is William Dubin's assertion that the district court erred by failing to adjust his sentence downward based on a lower restitution amount.  A downward sentence, he contends, necessarily flows from his restitution claim:  as a result of his claim that he should receive a vacated or revised restitution amount, his sentence must be lowered according to the newly calculated or vacated restitution.  Because his challenge to the restitution calculation fails, this one does as well.

## III.

For the foregoing reasons, the judgments are AFFIRMED.

Jᴇɴɴɪꜰᴇʀ Wᴀʟᴋᴇʀ Eʟʀᴏᴅ, *Circuit Judge*, concurring:

I concur in the majority opinion's affirmance of David Dubin's identity-theft conviction (Count 25) because our precedent requires it. *See United States v. Mahmood*, 820 F.3d 177, 187–90 (5th Cir. 2016). But I do so reluctantly and write to explain why the Sixth Circuit's decision in *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015) better interprets the statute at issue, 18 U.S.C. § 1028A.

Title 18 U.S.C. § 1028A is the "Aggravated Identity Theft" statute. That law imposes a mandatory two-year sentence on anyone who uses another person's means of identification without lawful authority during and in relation to theft of government funds. 18 U.S.C. § 1028A(a)(1); *see also Mahmood*, 820 F.3d at 188. In *Mahmood*, we held that § 1028A "plainly criminalizes situations where a defendant gains lawful possession of a person's means of identification but proceeds to use that identification unlawfully and beyond the scope of permission granted." 820 F.3d at 187–88. Hence, under *Mahmood*'s broad language, David Dubin violated § 1028A when he used Patient L's identity to lie about the exact contours of the services provided to Patient L.

But the statute does not require such a broad interpretation, and the Sixth Circuit explained why in *Medlock*. The Medlocks owned a non-emergency ambulance company. 792 F.3d at 703. Medicaid agreed to reimburse the Medlocks for patients' ambulance rides if the rides were "medically necessary." *Id.* Reimbursable transportations had to have an Emergency Medical Technician on board with the patient, and the Medlocks' company had to document each trip with a certification of medical necessity describing why the transportation qualified for reimbursement. *Id.* at 703–04. The Medlocks submitted certificates of medical necessity that contained several lies. For example, the Medlocks lied about patients being

transported on stretchers and said that the patients were accompanied by someone inside the ambulance when, in fact, the patient rode alone with the driver. *Id.* at 704, 708.

The Sixth Circuit reversed the identity-theft conviction because the Medlocks "misrepresented *how and why* the beneficiaries were transported, but they did not use those beneficiaries' identities to do so." *Id.* at 707. "[T]he Medlocks' misrepresentation that certain beneficiaries were transported by stretchers does not constitute a 'use' of those beneficiaries' *identification* . . . because their company really did transport them." *Id.* at 708.

In my view, the Sixth Circuit has the better interpretation of the statute.[1] There was simply no identity theft in *Medlock*, and there is none here. David Dubin lied to Medicaid about the exact contours of the services Patient L received, but did not misrepresent that Patient L did indeed receive services. Patient L's not receiving the full array of psychological services does not erase the fact that Patient L—and not someone else—received services. When he billed Medicaid, he lied about when a clinical interview was performed and about the type of person that performed the services. Thus, David lied about *when* and *how* Patient L received services, but did not lie about Patient L's identity or make any misrepresentations involving Patient L's identity. Nor did anyone else pretend to be Patient L. Therefore, any forgery alleged in this case, as in *Medlock*, was related only to the nature of the services, not to the patient's identity.

---

[1] In *United States v. Michael*, Judge Sutton, writing for the panel, favorably cited *Medlock*, which he said "held, quite correctly, that submitting false reimbursement requests about the nature of a service provided did not constitute 'use' of another's 'means of identification' but that forging a doctor's signature to bolster those submissions satisfied the statute." 882 F.3d 624, 628 (6th Cir. 2018). Again, here, as in *Medlock*, the forgery was about the nature of the services provided, not about anyone's identity.

We recently affirmed a § 1028A conviction in a healthcare fraud case where the defendants, unlike in this case, committed actual identity theft. *United States v. Anderson*, 822 Fed. App'x 271, 280 (5th Cir. 2020), *reissued as published on* November 6, 2020. Terry Anderson owned an optical and hearing aid center at which his son, Rocky Anderson, also worked. *Id.* at 273. Terry forged Rocky's signature to file insurance claims, and vice versa. *Id.* at 280. The Andersons also used the names of two people to file insurance claims for hearing tests and hearing aids when the people had never been tested by the Andersons and never received hearing aids. *Id.* Unlike in this case, there was real identity theft in *Anderson*.

For these reasons, if I were writing on a blank slate, I would follow the Sixth Circuit's interpretation of § 1028A as outlined in *Medlock*. Because we are bound by the holding in *Mahmood*, however, I concur in full.